## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

DEBRA COSTALES,

                                        Plaintiff,

            vs.                                        No. CIV. 97-0021 BB/LCS

QUANTUM HEALTH RESOURCES, INC.,

                                        Defendant.


### MEMORANDUM OPINION

THIS MATTER comes before the Court on defendant's November 14, 1997 motion for

summary judgment (Doc. 35).   Having reviewed the submissions of the parties and the relevant

law, the Court finds that defendant's motion should be GRANTED in part and DENIED in part.


## I.  Facts and Procedural History

This is a Title VII action in which plaintiff alleges defendant discriminated against her on

the basis of gender and national origin, by failing to promote her to an Office Manager position

filled by a white female, and by eventually terminating her while retaining a similarly situated

white male.

Plaintiff Debra Costales, an Hispanic female, was hired March 23, 1992 by defendant

Quantum Health Resources, Inc., described by defendant as a nationwide full service pharmacy

and infusion therapy facility catering to patients with chronic illnesses such as hemophilia and

growth hormone deficiency.  Her first position was Billing Specialist and Reimbursement

Supervisor, a post she held until January 1995.  Plaintiff may have taken on the duties of an office

manager during the time she worked as a Billing Specialist, but there is no evidence, other than

plaintiff's testimony, that her job ever carried that title.  Lou Herrera was her supervisor in this first position until he was promoted and moved to another office in October 1994, at which time Kim Karns became plaintiff's supervisor.  During plaintiff's tenure in this first position, Cleo Williams, a while female, was hired by defendant; plaintiff trained Ms. Williams in office duties.

In late 1994, plaintiff's billing job was eliminated in a company reorganization; she was transferred to a position as Customer Service Coordinator (CSC) in January 1995.  Also named as CSC at that time was Carnell Chappelle, a white male.  Mr. Chappelle had been hired in June or July of 1992.   Mr. Chappelle was married to Branch Manager Johanna Chappelle.  When he first started work, plaintiff trained him in the use of the computer and office telephones.  He worked in the office and the warehouse for a few months each until, in June 1993, he began to spend most of his work hours in the hemophilia clinic at the UNM Hospital.

Approximately three to four months after plaintiff and Mr. Chappelle were named CSCs, their supervisor Kim Karns divided the duties of the two positions by "disease states"; that is, she assigned Mr. Chappelle to work with hemophilia patients only, while plaintiff was assigned to work primarily with patients suffering other ailments, such as growth hormone deficiency and immune deficiency.

In February 1996, Cleo Williams was appointed Office Manager.  So far as can be discerned from the record, this position was never advertised.  Plaintiff did not submit an application for this job, nor did she tell anyone before the fact that she would be interested in applying for such a position, nor after the fact that she would have liked an opportunity to do so.

In March 1996, Quantum underwent a nationwide restructuring which resulted in a reduction in force. Plaintiff was laid off in this reorganization, while Mr. Chappelle was kept on; the reason given for plaintiff's termination was that the company had decided to retain its more lucrative hemophilia patients but to discontinue servicing the disease states for which plaintiff was responsible. Plaintiff declined defendant's offer of positions with the company in other cities.

Plaintiff sues under Title VII (42 U.S.C. §2000e et seq.), alleging discrimination on the basis of gender and national origin in failing to promote her to the Office Manager position assumed by Cleo Williams, and by terminating her employment as CSC while retaining Carnell Chappelle. Plaintiff also alleges a cause of action for retaliatory discharge under state law, claiming she was terminated for having reported discrimination and fraud.

Defendant has submitted a motion for summary judgment. The Court will grant the motion as to the claims based on failure to promote and retaliatory discharge. Summary judgment will be denied as to the claim of discrimination in termination.

**II.    Analysis.**

A.  There are insufficient facts to go to the jury on plaintiff's failure-to-promote claim.

Plaintiff's claim under Title VII that she was refused a promotion on racial or national origin grounds is to be analyzed under the burden-shifting scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). On summary judgment, plaintiff must first raise a genuine issue of material fact as to each of the elements of the prima facie "failure to promote" case: (i) that she belongs to a protected class; (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite being qualified, she was rejected; and

3

(iv) that, after her rejection, the position remained open and the employer continued to seek applications from persons of plaintiff's qualifications.  Hooks v. Diamond Crystal Specialty Foods, Inc., 997 F.2d 793, 796 (10th Cir. 1993), overruled on other grounds, Buchanan v. Sherrill, 51 F.3d 227 (10th Cir. 1995).  Once the prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the failure to promote, at which point the plaintiff takes up the burden of raising a factual issue as to whether defendant's proffered reasons were a pretext for discrimination.  McDonnell Douglas, supra, at 802-805; Hooks, supra, at 796.

Plaintiff has failed to raise a genuine issue of material fact with regard to the second element of the four-part cause of action.  She offers no argument on the issue of whether there was a job available for which the employer was seeking applicants, she acknowledges that she did not apply for the position, and she has not pointed to any evidence that the employer was on notice that she would be interested in such a position.

The general rule in a failure-to-promote case is that there must be an available position which defendant filled with a nonminority candidate because of an impermissible preference.  Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1362 (10th Cir. 1997).  Although generally a plaintiff who does not make application for a job change may not challenge as discriminatory the decision to fill a position she did not seek, Jones v. Unisys Corp., 54 F.3d 624, 631 n. 8 (10th Cir. 1995), plaintiff need not have made formal application for the job in question if the employer is "on specific notice that the plaintiff seeks employment or . . . [is] in the group of people who might reasonably be interested in the particular job."  Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1251 (10th Cir. 1992), cert. denied, 507 U.S. 973 (1993).

If plaintiff establishes that the company had some reason or duty to consider her for the post, the employer cannot avoid a Title VII violation by showing that it incorrectly assumed that plaintiff was uninterested in the job.  Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133-34 (11th Cir. 1984) (cited by the Tenth Circuit in Whalen).  Plaintiff in the present case has not made such a showing.  At no time during her employment as a CSC did plaintiff ever express an interest in doing any job other than the one she was doing.  She never told supervisors Kim Karns or Lou Herrera, or anyone else, that she no longer wanted to be a CSC and, upon hearing that Cleo Williams had been appointed to the post, she didn't let anyone at the company know that she would like to have been named Office Manager.[1]

Although plaintiff says that she herself occupied the position of Office Manager at some time prior to becoming a Customer Service Coordinator,[2]  the fact that she may in the past have assumed some of the duties of Office Manager is immaterial in light of the fact that she did not make application for the position in February 1996, did not let anyone know that she would be interested in such a position, and did not attempt to protest the promotion of Cleo Williams at the time it occurred.  Plaintiff has produced nothing to indicate that her supervisors should have known that she might be interested, and should have considered her for the post, other than the fact that she had some experience with the duties of the position.

------

[1] Costales Deposition at 439-41.

[2] She may have performed some "office manager" functions; however, there is no documentation to show that she ever carried this title, and she acknowledges that a company form was prepared when her title was changed to Customer Service Coordinator, but none was prepared for the asserted change to Office Manager.  Costales Deposition at 47, 58-59, 439.

She does state in her deposition that, in hindsight, she would have accepted the Office Manager position if she had been told her CSC job was going to disappear and "this is what's left."[3]  However, a non-applicant's "current willingness" to accept a job offer does not satisfy her burden of showing that she would have applied for a promotion if the opportunity had been made known to her at the time.  United States v. North Carolina, 914 F. Supp. 1257, 1261 n. 5 (E.D.N.C. 1996).

In spite of the fact that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981), plaintiff must raise issues of fact as to each element of the prima facie case in order to escape summary judgment, and she has failed to so in this case. Summary judgment should therefore be granted with respect to the February 1996 "failure to promote" incident.

B.  Plaintiff has raised a genuine issue of material fact that her termination was based on a discriminatory motive.

Plaintiff's claim of gender and national origin discrimination alleges preferential treatment of a white male employee who was retained when plaintiff was laid off.  This claim is to be analyzed under the McDonnell Douglas burden-shifting scheme, described above.

1.  Prima facie case.

In a reduction-in-force case, the plaintiff makes out a prima facie case by showing: (1) she belonged to a protected class; (2) she was adversely affected by the employment decision; (3) she was qualified for the position; and (4) she was treated less favorably during the reduction

---

[3] Costales Deposition at 440, 443-44.

in force than employees who were not members of a protected group.  Rea v. Martin Marietta Corp., 29 F.3d 1450, 1454 (10th Cir. 1994).

In Branson v. Price River Coal Co., 853 F.2d 768, 771 (10th Cir. 1988), an ADEA case, the court applied the McDonnell Douglas analysis, noting:

> Evidence that an employer fired qualified older employees but retained younger ones in similar positions is sufficient to create a rebuttable presumption of discriminatory intent and to require the employer to articulate reasons for its decision . . .  While reduction-in-force cases present exigencies not present in other employment discrimination cases, these exigencies are best analyzed at the stage where the employer puts on evidence of a nondiscriminatory reason for the discharge.

Plaintiff has made out a prima facie case.  As an Hispanic female, she is a member of a protected group.  She was adversely affected in that she was laid off.  It appears (and defendant concedes[4]) that she was generally qualified for the position of CSC, a position she had held for over a year with nothing on the record to indicate that she was not performing competently.  In a reduction-in-force case, the plaintiff need not show at the prima facie stage that she was "as qualified" as an employee retained in her place, Branson, supra, at 771 n. 6.  Finally, plaintiff was treated less favorably during the reduction in force than the only other CSC, a white male who was allowed to keep his job while plaintiff was laid off.  This is sufficient to establish a prima facie case.  Branson, supra, at 771.

Defendant argues[5] that plaintiff has failed to show that she was treated less favorably than other similarly situated employees who were not members of protected groups, pointing to

---

[4] Defendant's Reply at 7-8.

[5] Defendant's Memorandum at 14.

statistical evidence that the racial and gender makeup of employees laid off in 1996 was in

proportion to the overall racial/gender makeup of defendant's workforce.  While defendant's

statistical evidence may be relevant to the issue of pretext, it does not eliminate differential

treatment as a genuine issue of fact, since clearly plaintiff was treated less favorably than the one

employee whose circumstances most closely resembled plaintiff's.  "A racially balanced work

force cannot immunize an employer from liability for specific acts of discrimination."  Furnco

Constr. Corp. v. Waters, 438 U.S. 567, 579-80 (1978).

> 'It is clear that Congress never intended to give an employer license
> to discriminate against some employees on the basis of race or sex
> merely because he favorably treats other members of the
> employees' group.'  [Citation] . . . Title VII protects individuals, as
> well as groups, from discrimination on the basis of group
> characteristics.

Diaz v. American Tel. & Tel., 752 F.2d 1356, 1360 (9th Cir. 1985).

Plaintiff has made out a prima facie case of discrimination in termination.

2.  Assertion of a nondiscriminatory reason for the termination.

The burden now shifts back to defendant to assert a legitimate, nondiscriminatory reason

for laying off plaintiff while retaining Mr. Chappelle.   Kim Karns, plaintiff's supervisor at the time

she was terminated, states in her affidavit that she is the one who made the decision to lay off

plaintiff and keep Mr. Chappelle.  The reason for the difference in treatment, she says, was

because the duties of the two CSCs had been divided by "disease states," with Mr. Chappelle

servicing hemophilia patients exclusively and plaintiff servicing patients with other diseases,

including growth hormone deficiency and immune deficiency.   Ms. Karns states that, as a result

of the 1996 company-wide restructuring and budget cuts, the work involving non-hemophilia

disease states was eliminated from her department; since there was no other work to replace it, she made the decision to lay off plaintiff. She based her decision on the fact that Mr. Chappelle had been working with hemophilia patients since 1993, had personal contacts with these patients, and had developed good rapport with them.[6]

Plaintiff acknowledges that the two CSC positions were divided by disease states in about April or May of 1995, and that Mr. Chappelle was assigned to follow hemophilia patients while plaintiff would be working primarily with patients suffering from cystic fibrosis, immuno-deficiency, growth hormone deficiency, and primary pulmonary hypertension, plus any hemophiliac who spoke Spanish.[7] Plaintiff further states that she was aware that hemophilia patients were "big money makers" for the company, whereas the disease states which she serviced were not as profitable, and that she was told that the reason for her termination was because Quantum had decided to follow hemophilia clientele only. Plaintiff acknowledges that a decision to drop a less profitable segment in favor of a more profitable one would be a reasonable business decision.[8]

Thus, defendant has stated a facially nondiscriminatory reason for laying off plaintiff. The burden now shifts back to plaintiff to raise a factual issue as to whether defendant's asserted reason is a pretextual cover-up for gender or national origin discrimination.

---

[6] Exhibit B to Defendant's Memorandum, Karns Affidavit.

[7] Costales Deposition at 113-14.

[8] Costales Deposition at 339-43.

3. <u>Evidence of pretext</u>.

Plaintiff's allegations of pretext fall into three categories: (a) the original categorization of the two CSC jobs by "disease states" was done with a discriminatory motive; (b) plaintiff was subjected to, or heard about, racially derogatory remarks made by certain employees of defendant; and (c) she had better qualifications for the CSC job than did Carnell Chappelle, even considering that hemophilia was the only disease state left to service after the restructuring.

The evidence on the company's motivation in originally separating the CSC jobs into disease states, and the evidence involving racial remarks, are insufficient to raise a jury issue as to pretext. However, there is a genuine factual dispute as to whether plaintiff was better qualified for job opportunities which were given to Carnell Chappelle. The jury should be allowed to examine their comparative qualifications, in considering the issue of discriminatory motive.

(a)  <u>Original categorization by disease states</u>.

Kim Karns made the decision to divide the responsibilities of the two CSC positions by disease states; she allocated hemophilia to Mr. Chappelle because he had experience with and an understanding of the disease, and she allocated the other disease states to the plaintiff, whose previous experience had been in coordinating insurance benefits and billing of patient accounts.[9]

Plaintiff states in her affidavit that the division by disease states "was based on gender and ethnic factors";[10] however, she cites no basis for this belief apart from alleged racial remarks made by co-workers which, as discussed below, are not sufficient to support a finding of discriminatory motive. Furthermore, the affidavit statement should be disregarded, as it contradicts plaintiff's

---

[9] Exhibit B to <u>Defendant's Memorandum</u>, Karns Affidavit.

[10] Exhibit 5 to <u>Plaintiff's Response</u>, Costales Affidavit at ¶5.

earlier deposition testimony, <u>Bohn v. Park City Group, Inc.</u>, 94 F.3d 1457, 1463 (10th Cir. 1996), and appears to be a late attempt to manufacture an issue of fact in an effort to avoid summary judgment.

Prior to signing her affidavit, plaintiff had stated in her deposition that she believed the supervisor(s) had divided the job responsibilities by disease states and allocated hemophilia patients to Mr. Chappelle, because they wanted him "to stay in the clinic to capture the hemophilia business," and that this was a decision based purely on money factors, and not on any other grounds.[11]  She also said that she had no reason to think that either Lou Herrera or Kim Karns considered her race or gender in making the decision to assign Carnell Chappelle to the hemophilia patients and plaintiff to the other disease states,[12] that she had good working relationships with both Mr. Herrera and Ms. Karns, and that they had always treated her fairly.[13]

Plaintiff points to indications, mostly from her own testimony, that the division by disease states was unique to defendant's Albuquerque office, while at defendant's other locations around the country, CSCs are responsible for "all aspects of customer service in a designated geographic area."[14]  The affidavit of Ms. Karns establishes that this was a business decision which, while it may have been unusual for the company, was based on the already-existing

---

[11] Costales Deposition at 119.

[12] Costales Deposition at 347.

[13] Costales Deposition at 53-55, 120-21.

[14] Exhibit C to <u>Defendant's Memorandum</u>, Job Description for Customer Services Coordinator, ¶II (Job Summary); Costales Deposition at 78-79, 114, 117-18, 141-42.

division of labor between plaintiff and Mr. Chappelle.  "This court will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives."  Lucas v. Dover Corp., 857 F.2d 1397, 1403 (10th Cir. 1988).

Plaintiff has failed to raise a genuine issue of material fact on her claim that racial or gender discrimination motivated defendant's decision to divide the job duties by disease states.

(b)  Racial remarks.

Plaintiff notes in her Statement of Material Facts that both Carnell Chappelle and his wife Johanna Chappelle, whose job title was Branch Manager, were in the habit of speaking in derogatory terms of Hispanic patients and co-workers, but she makes no argument in her brief explaining the significance of these remarks.

The alleged remarks include Carnell Chappelle's statement that he would "buy pizza" for his Spanish-speaking patients rather than learn to speak the language himself; that plaintiff should get herself  "some better makeup," which she took to be a derogatory reference to the color of her skin; and that he repeatedly called another co-worker "ese," a reference to the worker's Hispanic heritage.[15]  Johanna Chappelle allegedly compared "Spanish people" to CHAMPUS, indicating she found them difficult to work with, accused "the Spanish people" of stealing some items from the Quantum-sponsored summer camp, and generally had negative things to say about Hispanic patients.[16]

---

[15] Costales Deposition at 449-50; Exhibit 2 to Plaintiff's Response, Vaughn Deposition at 42-44.

[16] Costales Deposition at 449-58.

The record is not clear as to Johanna Chappelle's sphere of authority; Leslie Vaughn states in her deposition that Ms. Chappelle was her direct supervisor and it was her impression that, as Branch Manager, Ms. Chappelle had supervisory authority over everyone at the facility.[17] The only other evidence on the record that Johanna Chappelle had authority over plaintiff's work is plaintiff's statement that Ms. Chappelle knew about her layoff before it occurred.  Johanna Chappelle apparently stated (although the documentation is not supplied) that she had no role in plaintiff's termination and layoff, and plaintiff has no facts to contradict this.[18]  There is, similarly, no evidence on the record that Johanna Chappelle took any part in the decision to retain her husband in the CSC job, in preference to plaintiff.

Plaintiff concedes that she knows of no racially derogatory remarks made by either Lou Herrera (who is himself Hispanic) or Kim Karns, the only two people who directly supervised plaintiff and one or both of whom made the decision to divide the disease states and eventually to terminate plaintiff.[19]

Stray remarks by persons who did not participate in the termination decision are insufficient to raise a jury question on the issue of the employer's intent.  In <u>Cone v. Longmont United Hosp. Ass'n</u>, 14 F.3d 526, 531-32 (10th Cir. 1994), an ADEA case involving allegedly "ageist" comments by the chief executive officer of the defendant hospital and its personnel director, the Tenth Circuit held:

---

[17] Exhibit 2 to <u>Plaintiff's Reply</u>, Vaughn Deposition at 260.

[18] Costales Deposition at 339-40, 343-44, 350-51.

[19] Costales Deposition at 347-49, 351-52.

13

> These statements are best characterized as stray remarks.  As such
> they are insufficient to create a jury issue in an ADEA case . . .
> Isolated comments, unrelated to the challenged action, are
> insufficient to show discriminatory animus in termination decisions.
> [Citations].  Ms. Cone must demonstrate a nexus exists between
> these allegedly discriminatory statements and the hospital's decision
> to terminate her . . .  Her evidence does not show the comments
> were directed toward her, her position, or the automatic
> termination policy.

See also,  Rea v. Martin Marietta Corp., supra, at 1457 (comment by corporate officer not involved in layoff decision, that "we might as well hire more lawyers because we are going to lay these older folks and special classes (minorities) off, " held insufficient to show discriminatory animus by the employer); and Figures v. Bd. of Pub. Util., 967 F.2d 357, 360-61 (10th Cir. 1992) (racial comments excluded as more prejudicial than probative, where plaintiff did not link the comments to any personnel action).   Similarly, plaintiff herein has not pointed to any evidence linking the alleged racial remarks to any personnel action taken against plaintiff.

In addition, some of the comments cited by plaintiff -- the makeup remark, the reference to CHAMPUS, "ese" -- are ambiguous.  Isolated or ambiguous comments may be "too abstract . . . to support a finding of . . . discrimination."  Cone, supra, at 531.   The comments at issue in this case are exactly the sort of ambiguous or "stray" remarks by non-decisionmakers that have been held insufficient to support a finding of discrimination; compare, for example, the much more concrete comments noted in Jones v. Unisys Corp., supra, at 632, and  Waggoner v. City of Garland, 987 F.2d 1160, 1166 (5th Cir.1993) (both age discrimination cases).

The racially derogatory remarks in this case, if any, were sometimes ambiguous, were relatively isolated occurrences, were not made by anyone involved in personnel decisions affecting plaintiff, and had no nexus to her termination nor to the decision to split the CSC job duties and

14

assign plaintiff to non-hemophilia cases.  This evidence does not assist plaintiff in raising a jury issue as to pretext.

(c) <u>Comparative qualifications</u>.

Defendant's asserted reason for retaining Mr. Chappelle while terminating plaintiff boils down to a claim that Mr. Chappelle was better qualified to treat patients with hemophilia, the only "disease state" left after corporate restructuring necessitated divestment of the non-hemophilia patients.  Plaintiff, in response, attempts to show pretext by demonstrating that she was actually better qualified than Mr. Chappelle, both generally and with regard to hemophilia patients.  There is a genuine issue of material fact on this question.

> Evidence that a plaintiff is as qualified as another employee chosen for promotion over him or her does not raise a factual issue as to pretext. [Citation].  Pretext can be inferred, however, from evidence that a plaintiff who was not promoted was more qualified than those employees who were promoted.

<u>Rea v. Martin Marietta Corp.</u>, <u>supra</u>, at 1457, also applying the same rule to employees laid off in a reduction in force.

Plaintiff's evidence on comparative qualifications is of two sorts: evidence that she is generally a better all-around employee than Carnell Chappelle, and evidence that she was better qualified specifically to handle hemophilia patients.

(i) <u>General qualifications</u>.

Plaintiff and Mr. Chappelle were hired at approximately the same time.  She had four months' seniority and showed him how to use the telephone and computer when he first came on.  They both became CSCs at the same time, in January 1995.[20]   Plaintiff has presented evidence

---

[20] Costales Deposition at 82-83, 94.

that she is bilingual and computer literate whereas Carnell Chappelle was not; these skills are listed in the job description.[21]

Plaintiff's performance appraisal of June 4, 1994[22] (written before she assumed the duties of CSC) is very positive, with several ratings in the "commendable" range, several in the "competent" range, and a number of complimentary comments from her then-supervisor, Lou Herrera.  A 1996 performance appraisal for Mr. Chappelle[23] is generally weaker than plaintiff's 1994 evaluation, with most of his ratings in the "adequate" to "competent" range, although two earlier "personnel action notices" for Mr. Chappelle,[24] supplied by defendant, contain complimentary statements about Mr. Chappelle.

Plaintiff states in her affidavit that, although she submitted all required monthly reports during her tenure as CSC, Carnell Chappelle did not submit any monthly reports until January 1996, a year after he assumed the CSC position.[25]  She also states that Mr. Chappelle did not attend any meetings of the "continuous chronic care improvement committee," that he was never in the office, and that he generally did not perform the same job duties as she did, as outlined in the CSC job description.[26]  The fact that Mr. Chappelle was not held to the typical CSC job duties

---

[21] Exhibit 3 to Plaintiff's Response, Halona Deposition at 122-23; Exhibit C to Defendant's Memorandum, Job Description for Customer Service Coordinator at 2.

[22] Exhibit 4 to Plaintiff's Response, at 1-4.

[23] Exhibit 4 to Plaintiff's Response, at 5-8.

[24] Exhibits A and B to Defendant's Reply.

[25] Exhibit 5 to Plaintiff's Response, Costales Affidavit at ¶3.

[26] Costales Deposition at 105, 337-38, 371, 388.

is confirmed by Leslie Vaughn, who also states that plaintiff was better than Mr. Chappelle about documenting her communications with patients.[27]

Carnell Chappelle was married to the Branch Manager at defendant's Albuquerque location, and inferences can be drawn from the evidence that Mr. Chappelle may have been treated preferentially because he was married to a manager in the office.  Although this circumstance would not give rise to a Title VII claim,  Benzies v. Illinois Dep't of Mental Health and Dev. Disabilities, 810 F.2d 146 (7th Cir.), cert. denied, 483 U.S. 1006 (1987); cited in Sanchez v. Philip Morris, Inc., 992 F.2d 244, 247 (10th Cir. 1993), nevertheless, the determination should be left to the jury as to whether it was Mr. Chappelle's marital affiliation, or his race or gender, or his superior qualifications, which secured his position while plaintiff was shown the door:

> At trial, the plaintiff must convince the jury not only that the reason proffered by the defendant was pretextual, but that the jury should infer that the defendant's pretext concealed a motive of discriminating against the plaintiff in violation of the civil rights laws.  It is this last inference which must be established at trial, but which is not required to be found by the judge at the summary judgment stage because drawing that ultimate inference from the evidence is within the province of the jury. [Emphasis in original].

Randle v. City of Aurora, 69 F.3d 441, 453 n. 18 (10th Cir. 1995).

(ii) Qualifications to service hemophilia patients.

Defendant's asserted reason for giving preference to Mr. Chappelle was that he was more experienced than plaintiff in dealing with hemophilia patients, the only category of patients

---

[27] Exhibit 2 to Plaintiff's Response, Vaughn Deposition at 93, 265.

17

remaining after the restructuring.  There is a genuine issue of fact whether plaintiff was better qualified to deal specifically with hemophilia patients.  The evidence on this issue is as follows:

Several of the job responsibilities of the CSC position were new to plaintiff when she assumed the job in 1995, including visiting patients at home, providing counseling services, and attending support group meetings.[28]  Defendant states that Carnell Chappelle performed at least some of these functions, including home visits, prior to assuming the actual title of CSC, although plaintiff disputes this.[29]

It is undisputed that in early to mid-1993, Mr. Chappelle began working, as part of his duties as CSC, at the hemophilia clinic at UNM Hospital; however, the record is not clear as to whether this work included direct dealings with patients.[30]  Plaintiff concedes that Mr. Chappelle was successful in acquiring new patients for defendant through his involvement with the UNM hemophilia clinic, whereas plaintiff never brought in a new patient.[31]  She says that although it would have been perceived as a positive thing if she had brought in new patients, it was not part of her job to do so; the job description seems to confirm this, as it contains only a vague reference to a CSC's duty to participate in "the overall marketing/sales strategy."[32]

---

[28] Costales Deposition at 65-67.

[29] Costales Deposition at 83-86, 106-10.

[30] Costales Deposition at 84-85, 95-97, 106-109.

[31] Costales Deposition at 96-97, 107-108, 134-136.

[32] Costales Deposition at 134-135; Exhibit C to Defendant's Memorandum, Job Description of Customer Services Coordinator.

Although plaintiff was allocated non-hemophilia patients during her time as a CSC, she also dealt with those hemophilia patients who spoke only Spanish.[33]   Plaintiff asserts that she continued to deal with hemophilia patients during the entire time that she was CSC, in that she provided insurance and billing information to such patients and was appointed co-director of the annual summer camp for hemophilia sufferers.  Plaintiff does acknowledge that, unlike Mr. Chappelle, she never worked at the UNM hemophilia clinic, although again this was not part of her job description.[34]

This evidence, while it may not convince a jury, is sufficient to raise a factual issue as to whether plaintiff was better qualified than Mr. Chappelle for the job of CSC.  Carnell Chappelle appears from the record to be the kind of employee who didn't always follow the rules and who molded the CSC job to suit himself, to the annoyance of plaintiff and other employees of defendant, but with surprisingly beneficial results for his employer.  He may have been given opportunities denied to plaintiff because he was a white male and she was not, or he may have been given greater leeway because he was married to the boss, he may have been seen as a superior employee, or there may be other reasons for the differential treatment.  It is appropriate to let the jury decide this; therefore, summary judgment will be denied as to the claim involving plaintiff's termination.

---

[33] Costales Deposition at 113-114; Exhibit B to Defendant's Memorandum, Karns Affidavit at ¶7.

[34] Costales Deposition at 73-74, 116, 119.

C.  There are insufficient facts to go to the jury on plaintiff's retaliatory discharge claim.

Plaintiff's state law retaliatory discharge claim is based on her allegation that she "expressed to Defendant's supervisors, managers, and agents her disagreement with fraudulent billing procedures involving Medicare/Medicaid, the administration of services provided to hemophilia patients, and the disparate treatment she received as a Customer Service Coordinator," and that in retaliation for having reported such discrimination and fraud, she was refused a promotion to the position of Office Manager, and was terminated.[35]

There is a dispute between the parties as to whether Indiana law or New Mexico law governs this cause of action, since the employment agreement signed by plaintiff provides that it shall be governed by the laws of Indiana.  However, under either state's law, summary judgment is appropriate on this cause of action.

1.  Indiana Law.

Indiana's cause of action for retaliatory discharge is very narrow.  The activity for which the employee was fired must have been based on a clear statutory right or duty, or else plaintiff must have refused to do an illegal act for which he personally could incur penal sanctions. Plaintiff has not demonstrated that either circumstance applies in this case.

Plaintiff herein was an "at-will" employee.[36]  Indiana law on retaliatory discharge holds that "under ordinary circumstances, an employee at will may be discharged without cause; however, "when an employee is discharged solely for exercising a statutorily conferred right, an

---

[35] Plaintiff's Complaint at ¶¶ 43, 45.

[36] Exhibit E to Defendant's Memorandum, Employment Agreement at ¶ 20(a).

exception to the general rule must be recognized."  Frampton v. Central Indiana Gas Company, 260 Ind. 249, 253,  297 N.E.2d 425, 428 (1973).

This exception has been very narrowly applied by the Indiana courts.  There must be a "clear statutory expression of a right or duty that is contravened," Wior v. Anchor Industries, Inc., 669 N.E.2d 172, 178 (Ind. 1996), or the employee must have been fired for refusing to do an illegal act for which he could incur personal penal sanctions, McClanahan v. Remington Freight Lines, Inc., 517 N.E.2d 390 (Ind. 1988).   "Even good faith whistle blowers are not within the exception."  Wilmington v. Harvest Ins. Companies,  521 N.E.2d 953, 955 (Ind. App. 1988).

Plaintiff has not pointed to any "statutory right or duty" under Indiana law which she was fired for attempting to vindicate. Indeed, in her Response, plaintiff has made no argument at all on the retaliatory discharge claim.  She has, certainly, pointed to nothing on the record to show that she was fired for refusing to perform an illegal act for which she could incur personal penal sanctions.   Therefore, plaintiff's only hope under this cause of action is to look to New Mexico law, which is much broader than Indiana's:

> [S]tatutes are not the sole source of public policy . . .  Legal scholars have . . . recognized that protecting only those whistleblowers whose actions derive from a specific statutory duty is inconsistent with the origin of the tort of wrongful discharge and results in broad societal harm.

Gutierrez v. Sundancer Indian Jewelry, Inc., 117 N.M. 41, 47-48, 868 P.2d 1266 (Ct. App. 1993),

cert. denied, 117 N.M. 121, 869 P.2d 820 (1994).

2.  <u>New Mexico Law</u>.

The elements of a cause of action for retaliatory discharge under New Mexico law are:

(1) the employee was discharged because he performed an act that public policy has authorized or

encouraged, or refused to do something that public policy condemns; (2) the employer knew or

suspected that the employee's action involved a protected activity; (3) there was a causal

connection between the employee's protected actions and the employer's act of discharging him;

and (4) the employee suffered damages thereby.  <u>Weidler v. Big J Enterprises, Inc.</u>, 1998-NMCA-

021,  ¶23, 1997 WL 833968, at *6 (N.M. App. December 17, 1997).

> Although the New Mexico courts have not formally adopted a
> shifting burden of production framework such as that used to
> interpret federal law, [citation], they have recognized that "the
> central element of retaliatory discharge is whether the employer's
> motive for discharging the employee was the employee's
> engagement in the protected activity."

<u>Brillhart v. Philips Electronic North America Corp.</u>,  938 F. Supp. 742, 745 (D.N.M. 1996).

To establish a causal connection, plaintiff must show that the employer was aware that the

employee was engaging in a legally protected activity, because "an employer cannot fire an

employee in retaliation for actions of which the employer is unaware."  <u>Lihosit v. I & W, Inc.</u>, 121

N.M. 455, 458, 913 P.2d 262 (Ct. App.), <u>cert. denied</u>, 121 N.M. 444, 913 P.2d 251 (1996).  The

employer need not have actual knowledge of the protected activity; it is sufficient if he believes or

suspects that the employee was engaging in such activity.  <u>Weidler</u>, <u>supra</u>.  However, the fact that

defendant's nonsupervisory employee or agent was aware of the activity will not establish liability,

where the knowledge was not communicated to the employer itself.  <u>Lihosit</u>, <u>supra</u>, at 460.

22

Plaintiff's evidence of alleged protected activity, and defendant's knowledge or suspicion about such activity, is as follows:

Plaintiff says she told pharmacist Leslie Vaughn in 1995 about preferential treatment being given to one hemophilia patient, in the form of defendant's paying for certain items not given to other patients.  Although plaintiff says she engaged in other discussions about this matter, she can't give any dates, times, or names of the persons involved.  Leslie Vaughn was not in a supervisory position to plaintiff, and she did not relay plaintiff's information on preferential treatment to anyone else at the company.[37]

Mentioning to a co-worker that one patient was treated preferentially is not "an act that public policy has authorized or encouraged"; compare, for example, the whistleblowing activity of the plaintiff in Gutierrez v. Sundancer Indian Jewelry, Inc., supra, who contacted the Occupational Health and Safety Bureau of the New Mexico Health and Environment Department, requesting an investigation of chemical usage and employee health problems at Defendant's workplace.  Not only was plaintiff's action in that case undertaken in an effort to vindicate an important policy of state law -- the employer's duty to provide employees with a reasonably safe workplace -- but there is, furthermore, no question that the employer was aware that plaintiff was thereby engaging in protected activity.  In the present case, the record is clear that no one in a supervisory position at the company was aware that plaintiff had engaged in this conversation with Ms. Vaughn nor had any reason to suspect that plaintiff, by talking to Ms. Vaughn, was engaging in protected activity.

---

[37] Costales Deposition at 206-14; Exhibit D to Defendant's Memorandum, Vaughn Deposition at 89-91.

Plaintiff also states that, sometime during the first two years of her employment at Quantum, she had a conversation with her supervisor Lou Herrera about the company's billing practices. The content of this conversation is unclear; it appears that the company was informed by a Medicaid auditor that certain "assigned codes" for the billing were being handled incorrectly. Plaintiff says she asked Mr. Herrera, "What are the billers doing? Why are they using these codes?" He responded that he was already aware of the auditors' concerns. She acknowledges that she was not reporting anything to Mr. Herrera that the auditors had not already raised, and that her reason for bringing it to his attention was to make sure that he was taking care of it.[38] She seems to have satisfied herself on this point, as the issue of billing codes did not arise again, and plaintiff continued her employment with defendant for at least three years following this incident.

She also says that she had one discussion with pharmacist Leslie Vaughn "about the way some of the medication was getting billed," and one other conversation with Sharon Younger, who worked in billing and who called to tell plaintiff that Lou Herrera had asked her to change "the number of units that were billed for factor on a patient." There is no explanation as to what this means. Plaintiff says she made a note of Ms. Younger's concern and gave the information to Mr. Herrera. She didn't report to anyone that there was anything improper about Mr. Herrera's actions in connection with this billing incident.[39]

Again, these conversations contrast markedly with traditional whistleblowing activity which has a tendency to put the employee's job at risk, such as that involved in Gutierrez, supra.

_____

[38] Costales Deposition at 289-93.

[39] Costales Deposition at 292-97.

At no time during her employment did plaintiff report to a supervisor that she thought the company was doing anything wrong nor did she report any malfeasance, in the sense of improper billing or anything else, to any law enforcement authority or any government agency.  Plaintiff never thought she was "blowing the whistle" on any person or any goings-on at the company during the course of her employment there.[40]

On this record, there is no evidence that plaintiff was engaging in any act that public policy authorizes or encourages, there is no indication that anyone in a supervisory position was aware or should have suspected that plaintiff was engaging in protected activity, nor is there any factual basis to support a causal connection between any alleged whistle-blowing activity and plaintiff's discharge. The descriptions of the two conversations with supervisor Lou Herrera are extremely vague, and plaintiff has done nothing to clarify their import.  On this record, plaintiff has failed to raise an issue for the jury on any element of the retaliatory discharge cause of action.

## III.   Conclusion.

The Court will grant summary judgment as to the claims based on failure to promote and retaliatory discharge.  Summary judgment will be denied as to the Title VII claim for wrongful discharge based on gender and national origin discrimination.  An Order in accordance with this Memorandum Opinion will issue.

Dated at Albuquerque this 16th day of April, 1998.

BRUCE D. BLACK
United States District Judge

_____

[40] Costales Deposition at 297-99.